Theodore KING and Gary Labarbera, as Trustees and Fiduciaries of the Local 282 Welfare Trust Fund, the Local 282 Pension Trust Fund, the Local 282 Annuity Trust Fund and the Local 282 Job Training Trust Fund, Plaintiffs,

v.

PLAN IT CONSTRUCTION & EQUIPMENT COMPANY, Defendants.

No. CV 99–3323 ADS ETB.

United States District Court, E.D. New York.

Jan. 14, 2002.

Cohen, Weiss and Simon, LLP, New York, NY (Dorothy E. Hill, of Counsel), for plaintiffs.

Law Offices of Richard M. Ziskin, Commack, NY by Richard M. Ziskin, for defendant.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

On June 11, 1999, Theodore King and Gary LaBarbera, Trustees and Fiduciaries of the Local 282 Welfare Trust Fund, the Local 282 Pension Trust Fund, the Local 282 Annuity Trust Fund and the Local 282 Job Training Trust Fund (the "Trustees" or the "plaintiffs") filed the complaint in this action seeking injunctive and equitable relief under Sections 501 and 515 of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(3), 1145. In particular, the Trustees sought to compel: (1) Plan It Construction & Equipment Company ("Plan It" or the "defendant") and Semcor Equipment and Manufacturing Corporation ("Semcor") to comply with the surety bond requirements set forth in their respective collective bargaining agreements ("CBA's") with Building Material Teamsters Local 282 ("Local 282" or the "Union"); (2) Semcor to submit to a payroll audit; and (3) Semcor to pay delinquent benefit contributions.

On October 10, 2001, the Court commenced the non-jury trial of this case. Later that day and in the midst of the trial, the parties agreed to settle the action as between the Trustees and Semcor. The Trustees and Plan It did not resolve their only disputed issue, which is whether Plan It must comply with the surety bond requirement set forth in its CBA with the Union even though the CBA has expired. Since the issue is a purely legal one, the Court terminated the bench trial and directed the parties to file letter applications in support of their respective positions.

In an order dated December 19, 2001, the Court approved the stipulation of settlement between the Trustees and Semcor and dismissed the claims against Semcor with prejudice. Thus, the only issue presently before the Court pertains to Plan It's obligation, if any, to post a surety bond.

## I. BACKGROUND

The following facts are undisputed, unless otherwise indicated. The Trustees are fiduciaries of Local 282 Welfare Trust Fund, Pension Trust Fund, Annuity Trust Fund, and Job Training Trust Fund (the "Funds") within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A). The Trustees have discretion and control over the assets and administration of the Funds. The Funds are "employee benefit plans" and "multiemployer plans" within the meaning of Sections 3(3) and 3(37) of ERISA, 29 U.S.C. § 1002(3) and § 1002(37). The Funds are administered by a Board of Trustees comprised of an equal number of labor and management representatives in accordance with Section 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5).

Plan It is a New Jersey corporation engaged in the business of building, construction, and renovation in New York. On July 30, 1998, a Union representative and Attilio Domante, the President of Plan It, signed a contract binding Plan It to the 1996–1999 Local 282 Building Contractors Association and Independents High–Rise Contract (the "High–Rise Agreement") for the period July 30, 1998 through June 30, 1999. Thus, for that eleven-month period, Plan It was a party to the High Rise Agreement with the Union.

The High–Rise Agreement is a CBA that requires signatory employers to make monthly contributions to the Funds on behalf of their covered employees, at specified rates for each hour of covered employment, subject to certain limitations. The High Rise Agreement also provides that the signatory employer and the Union agree to be bound by the terms of an Agreement and ·Declaration of Trust (the "Trust Agreement"). The Trust Agreement establishes the Funds, collects and receives contributions from employers, and provides retirement, health and job training benefits to eligible employee participants.

In regard to the obligation to provide a surety bond, the High Rise Agreement states, in relevant part:

> (A) The Employer shall provide a Surety Bond to guarantee payment of

contributions to the welfare, Pension, Annuity and Job Training Funds and Dues to the Union, as provided for in this Agreement.

The High Rise Agreement lists the various bond amounts, which are based on the number of employees on the employer's seniority list. The High Rise Agreement further provides that in lieu of "a bond to secure payment of contributions to the Welfare, Pension, Annuity and Job Training Funds," an employer may, with the Trustees' written permission, deposit cash in an escrow account or deliver a pre-approved personal guarantee to the Trustees.

Plan It was required to post a bond or alternate security because it was a party to the High Rise Agreement. However, the company has not satisfied this requirement. By letter dated October 15, 1998, Fund manager William Maye advised Plan It of its obligation to comply with the surety bond provision of its CBA with Local 282. In letters dated August 31 and November 4, 1998, and in a telephone conversation on November 4, 1998, Joseph Puccio, the Fund representative responsible for monitoring employer surety bonds, told Plan It how to obtain a bond or alternate security. By letter dated March 11, 1999, counsel to the Funds requested that Plan It post a bond or provide alternate security. As of the date of this decision, Plan It has not posted a bond or alternate security.

Plan It is not a party to the 1999–2002 successor High Rise Agreement. As such, the company has no obligation to post a bond under that successor agreement.

## II. *DISCUSSION*

Summary judgment is appropriate if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Turner v. General Motors Acceptance Corp.*, 180 F.3d 451, 453 (2d Cir.1999); *see* Fed.R.Civ.P. 56(c); *Hunt v. Cromartie*, 526 U.S. 541, 119 S.Ct. 1545, 1550, 143 L.Ed.2d 731 (1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The burden of showing that no genuine factual dispute exists rest son the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994). "The burden on the moving party may be discharged by 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548; *see Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (holding that the movant satisfies his burden by pointing to "an absence of evidence to support an essential element of the nonmoving party's claim"). In determining whether the moving party has satisfied its duty, the Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion. *See Chambers*, 43 F.3d at 36; *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998).

If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Indeed, the nonmoving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *D'Amico*, 132 F.3d at 149;

*Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 101 (2d Cir.1997).

Section 515 of ERISA provides that:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with the law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Section 502 of ERISA, 29 U.S.C. § 1132(a)(3), grants the trustees of a plan the right to bring an action in federal district court to enforce an employer's duty to contribute under section 515. *See Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 312–13 (2d Cir.1990) (stating that district courts clearly have subject matter jurisdiction over actions brought by trustees to enforce an employer's promise to make contributions).

Congress added Section 515 to ERISA to "permit trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law." *Benson*, 907 F.2d at 314 (quoting 126 Cong.Rec. 23,039 (1980) (remarks by Representative Thompson)). " 'Participants and beneficiaries of plans as well as employers who honor their obligation to contribute in a timely fashion bear the heavy cost of delinquencies in the form of lower benefits and higher contribution rates.' " *Id.* (quoting 126 Cong.Rec. 23,039). Indeed, "benefit plans must be able to rely on the contribution promises of employers because plans must pay out to beneficiaries whether or not employers live up to their obligation." *Id.* (citing *Central States S.E. & S.W. Areas Pension Fund v. Independent Fruit & Produce Co.*, 919 F.2d 1343, 1348 (8th Cir.1990)). Thus, Congress enacted Section 515 to "simplify

actions to collect delinquent contributions, avoid costly litigation, and enhance the actuarial planning necessary to the administration of multiemployer pension plans." *See Central States*, 919 F.2d at 1348.

The Second Circuit has found that in passing the legislation amending ERISA to include Section 515, Congress "placed employee benefit plans in a position superior to the original promisee, analogous to a holder in due course." *Benson*, 907 F.2d at 314. In adhering to the stated purpose of Section 515, the Second Circuit also found that Congress intended to limit the defenses available to an employer when sued by an employee benefit plan. *Benson*, 907 F.2d at 314. The Court stated that its research revealed only two defenses available to employers: (1) that the contributions themselves are illegal; and (2) that the collective bargaining agreement is void (not merely voidable). *Benson*, 907 F.2d at 314. In regard to the second defense, the Court explained that fraud in the execution renders a contract void, whereas fraud in the inducement renders a contract merely voidable. *Benson*, 907 F.2d at 314. "Thus, once an employer knowingly signs an agreement that requires him to contribute to an employee benefit plan, he may not escape his obligation by raising defenses that call into question the union's ability to enforce the contract as a whole." *Benson*, 907 F.2d at 314.

The Second Circuit clarified the holding of *Benson* in *DeVito v. Hempstead China Shop, Inc.*, 38 F.3d 651 (2d Cir.1994). Noting that Section 515 requires "contributions only 'in accordance with the terms and conditions of' " the CBA, *DeVito*, 38 F.3d at 653 (quoting Section 515 of ERISA, 29 U.S.C. § 1145), the Second Circuit held, "Although a variety of contract defenses would not preclude [plaintiffs] from enforcing their right to collect pay-

ments pursuant to the collective bargaining agreement, [they] are not entitled to enforce a nonexistent contractual obligation." *DeVito*, 38 F.3d at 653 (quoting *Teamsters Indus. Employees Welfare Fund v. Rolls–Royce Motor Cars, Inc.*, 989 F.2d 132, 138 (3d Cir.1993)).

Plan It claims that it is not required to post a surety bond because the High Rise Agreement expired on June 30, 1999. Although Plan It's defense is not one of the two permissible defenses outlined in *Benson*, under *DeVito*, the Court must evaluate Plan It's obligation to post a bond under the terms and conditions of the CBA. *See DeVito*, 38 F.3d at 653.

 When a court interprets a CBA, the traditional rules of contract interpretation apply, provided they are consistent with fair labor policies. *See Aeronautical Indus. Dist. Lodge 91 v. United Technologies Corp.*, 230 F.3d 569, 576 (2d Cir.2000); *Demolition Workers Union v. Mackroyce Contracting Corp.*, 97 CV 4094, 2000 WL 297244 *34 (S.D.N.Y. March 22, 2000) (applying general contract law principles to evaluate the employer's obligations to the Funds under the terms and conditions of the CBA). The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement. *Compagnie Financiere De Cic Et De L'UNION Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir.2000) (citing *Sayers v. Rochester Te. Corp. Supplemental Management Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993)).

Generally, summary judgment is proper in a contract dispute only if the language of the contract is "wholly unambiguous." *Compagnie Financiere*, 232 F.3d at 157 (citing *Mellon Bank v. United Bank Corp.*, 31 F.3d 113, 115 (2d Cir.1994)); *Trustees of the Bricklayers and Allied Craftworkers*

*v. Charles T. Driscoll Masonry Restoration Co., Inc.*, 165 F.Supp.2d 502, 510 (S.D.N.Y.2001) (stating that for the plaintiffs to succeed on their summary judgment motion, they must show that the CBA creates an unambiguous contractual obligation on the defendants to make contributions).

 Whether language is clear or ambiguous is a question of law to be decided by the Court. *Id.* at 158. Contract language is unambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992). On the other hand, "[c]ontract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Sayers*, 7 F.3d at 1095.

 The interpretation of ambiguous contract language generally is an issue of fact to be resolved by the factfinder. *Compagnie Financiere*, 232 F.3d at 158. However, a court may determine the meaning of ambiguous contract language "if there is no extrinsic evidence to support one party's interpretation of the ambiguous language or if the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation." *Compagnie Financiere*, 232 F.3d at 159. Similarly, a court may interpret ambiguous contract language when the extrinsic evidence creates no genuine issue of material fact. *Id.* at 158.

In regard to a signatory employer's obligation to post a surety bond, the High Rise Agreement states, in relevant part, "The Employer shall provide a Surety

Bond to guarantee payment of contributions to the welfare, Pension annuity and Job Training Funds and Dues to the Union, as provided for in this Agreement." Plan It argues that this sentence, when read together with the Agreement's expiration date of June 30, 1999, requires the company to maintain a surety bond only until June 30, 1999. On the other hand, the Trustees assert that the quoted language requires Plan It to maintain a bond until the Trustees have completed a final audit of the company's books and records.

The parties have not pointed to, nor has the Court found, a provision in the CBA that explicitly supports either position. The High Rise Agreement neither describes the length of time an employer is required to maintain a bond nor provides a specific expiration date for the bond. The CBA does not state, for example, "The obligation to post a surety bond shall remain in effect until the final close-out audit has been completed"; "The obligation to post a surety bond shall terminate on the last effective date of the CBA"; or "The obligation to post a surety bond shall remain in effect until 30 days after the date on which the CBA terminates". To the extent that the Court cannot determine from the plain language of the CBA a precise date on which Plan It is no longer required to maintain a bond, the Court finds that the bond provision is ambiguous in regard to the date the requirement terminates. *Compare Sayers,* 7 F.3d at 1095 (holding that language is ambiguous if it is capable of more than one meaning) *with Seiden,* 959 F.2d at 428 (holding that language is unambiguous when it has a "definite and precise meaning, unattended by danger of misconception").

The Court finds that it has the authority to determine the meaning of the surety bond provision, because there is no extrinsic evidence to support Plan It's interpretation of the High Rise Agreement. *Compagnie Financiere,* 232 F.3d at 158–59. Plan It's sole argument is that the holding in *Brown v. J.F.H. Mak Trucking,* 95 CV 2118, 1999 WL 1057274 *2 (E.D.N.Y. Nov.8, 1999) (Seybert, J.), compels this Court to conclude that the bond requirement expired upon the termination of the CBA. The Court in *Brown* issued a default judgment enjoining the employer "to provide a surety bond ... in the amount of $10,000 and maintain such bond ... throughout the term of the company's collective bargaining agreement." *Id.* When the employer failed to post the bond, the plaintiffs moved to hold the defendants in contempt based on the injunction in the default judgment. *Id.* The Court found that the language, "maintain such bond ... throughout the term of the company's collective bargaining agreement," tied the life of the injunction to the life of the CBA. *Id.* Thus, when the CBA terminated on June 30, 1999, so too did the injunction requiring the defendants to post the bond. *Id.* The Court concluded, therefore, that the defendants were not in contempt for failing to post a bond after the termination of the CBA. *Id.*

The holding in *Brown* is inapplicable to this case, because here, the obligation to post a bond stems from the CBA not a court order stating that the employer need only maintain the bond throughout the term of the CBA. Moreover, unlike the bond requirement in the High Rise Agreement, the injunction in *Brown* contains express language setting forth the term of the bond. As *Brown* is easily distinguished from the circumstances of this case, its holding cannot be applied.

■ Plan It offers no other argument, much less extrinsic evidence, in support of its assertion that its duty to maintain a bond ended on June 30, 1999. Thus, the Court may interpret the bond provision of

the High Rise Agreement. *See Compagnie Financiere,* 232 F.3d at 159. The intent of the parties, as revealed through the language of the CBA, *id.* at 157, compels Plan It to post a surety bond until the Trustees perform the final audit. As noted above, the High Rise Agreement states that the employer must "provide a Surety Bond to guarantee payment of contributions" to the Funds. It is reasonable to infer from this language that the Union and Plan It intended for the surety bond to guarantee the company's promise to contribute to the Funds. The parties' intent would not be realized if this Court interpreted the bond provision of the Agreement to require Plan It to maintain the bond only until June 30, 1999. The Trustees do not complete the close-out audit until after the termination of the High Rise Agreement. Thus, the Trustees cannot confirm that all the contributions have been made until after the CBA expires. If the bond agreement terminated at the same time the CBA did, the bond would not guarantee that the employer made all of its required contributions, which is the very purpose of the bond. Thus, applying the intent of the parties as revealed in the language of the Agreement to the bond provision, the Court concludes that the CBA requires Plan It to maintain the bond until after the close-out audit has been completed.

The Court's interpretation of the bond provision is supported by the cases in this area. It is well settled that an employer "does not escape its obligation for *delinquent* payments merely because the collection action is commenced at a time not covered by a collective bargaining agreement." *Benson v. Brower's Moving & Storage, Inc.,* 726 F.Supp. 31, 34 (E.D.N.Y. 1989), *aff'd,* 907 F.2d 310 (2d Cir.1990). In light of the fact that an employer is responsible for past contributions despite the expiration of a CBA and the fact that those contributions are ensured by the maintenance of a surety bond, an employer cannot escape its obligation to maintain a bond to cover past contributions simply because the CBA has expired. *See generally Benson,* 726 F.Supp. at 34. Where, as here, the CBA has expired but the Trustees have not performed the close-out audit, the bond requirement survives the expiration of the CBA, because the bond insures against the possibility of delinquent contributions, which was the intent of the parties as evidenced by the language of the CBA.

## III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that the plaintiff's motion for summary judgment is **GRANTED**; and it is further

**ORDERED,** that the defendant Plan It is directed to post a surety bond in the amount and manner outlined by the High Rise Agreement; and it is further

**ORDERED,** that the defendant Plan It is directed to maintain the above-described surety bond until such time as the plaintiff Trustees conduct a final close-out audit; and it is further

**ORDERED,** that the plaintiff Trustees are directed to conduct the final close-out audit forthwith; and it is further

**ORDERED,** that the Clerk of the Court is directed to close this case.

**SO ORDERED.**